IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Senior Judge Walker D. Miller

Civil Action No. 09-cv-00882-WDM-CBS

FURLONG ENTERPRISES, LLC,
RESIDENTIAL BUILDING SYSTEMS, INC., and
DAVE AND LANA WATERS, INC., d/b/a D & L CONSTRUCTION,

      Plaintiffs,

v.

JACK NICKERSON, individually and in his capacity of Director of Public Works, City of
Cortez, and
CITY OF CORTEZ, a Colorado Charter City,

      Defendants.

---

## ORDER ON MOTIONS FOR SUMMARY JUDGMENT

---

Miller, J.

      This case is before me on the Motion for Summary Judgment (ECF No. 79) filed by

Defendant City of Cortez (the "City") and Defendant Nickerson's Motion for Summary

Judgment Based Upon Qualified Immunity (ECF No. 72). Plaintiffs oppose the motions.

I have reviewed the pertinent portions of the record and the legal authorities and arguments

contained in the parties' briefs. For the reasons that follow, the motions will be granted.

<u>Background</u>[1]

      Plaintiffs allege that the City's Public Works Department and Jack Nickerson, its

Director, have violated their civil rights by virtue of certain decisions made regarding

construction projects. Plaintiff Furlong Enterprises ("Furlong") also asserts a claim of

---

[1]The following facts are taken from the parties' briefs and attached exhibits and
are undisputed unless otherwise noted.

breach of contract.

Furlong, Residential Building Systems, Inc. ("RBS"), and D & L Construction "D & L") are construction companies involved in various projects in and around the City.   The principals of Furlong are John and Stacey Stramel and Dave Kimble.  D & L is owned by Dave and Lana Waters.  RBS is owned by Don Etnier.

Furlong, with assistance from D & L, is constructing a development called Brandon's Gate Planned Unit Development ("Brandon's Gate").  RBS is constructing a development known as Sedona Estates Phase 3 ("Sedona Estates").   D & L is also involved in the construction of a development known as San Juan Park Addition or the Acoma Special Improvement District ("Acoma SID").  Brandon's Gate and Sedona Estates are residential developments and, pursuant to City regulations, the developers were required to enter into Subdivision Improvement Agreements ("SIA") with the City.  In general, the SIA concerns the obligation of the developer to construct public improvements in the development, such as roads, water lines, sewers, storm drains, and other infrastructure.  *See, e.g.*, Brandon's Gate SIA, Exh. A-3 to City's Mot. for Summ. J., ECF No. 79-5, at ¶ 1.

The Acoma SID resulted from a petition by lot owners, including the Waters, to create a special improvement district to construct certain street paving improvements in an existing neighborhood.  Exh. A-2 to City's Mot. for Summ. J., ECF No. 79-4.  The Acoma SID was passed by a government resolution and was a City funded, designed, engineered, and bid project.  *Id.*  Because the Acoma SID is a City project, there is no SIA.  *Id.*  D & L submitted the lowest bid and was awarded the project.  Exhs. A-5 & A-6 to City's Mot. for Summ. J., ECF Nos. 79-7, 79-8.

In their Amended Complaint (ECF No. 8), Plaintiffs assert that the City permitted

2

developers of two other projects to use native soil as trench backfill in construction of right of ways ("ROW") and roadways but that Plaintiffs, unaware that the City might permit this, used more expensive backfill material, known as CDOT[2] Class 6 A.B.C. ("Class 6"), pursuant to their understanding of the City's requirements.  Plaintiff Furlong also asserts a contract claim based on a cease and desist order arising out of a dispute over roadway construction design, issued May 23, 2007, and other alleged breaches of the SIA.

Plaintiffs' claims concerning the backfill issue rest in large part on the interpretation and application of the City's Construction Design Standards ("CDS"), which were modified over the years.  It appears to be undisputed that the Plaintiffs' projects were all subject to the 1980 CDS.  That version the CDS does not specify any particular material to be used for trench backfill.  1980 CDS, Exh. A-7 to City's Mot. for Summ. J., ECF No. 79-9, at Sec. 4.4.2.A (generally requiring backfill material to consist of "sound earth material free from frozen materials, large rocks, broken concrete, timber, and other debris.").  The parties agree that by its plain terms, it does not prohibit the use of native soil as backfill or require Class 6.  However, according to deposition testimony by Bruce Smart, the Director of Public Works until April 2007, the City had previously experienced problems with trench settlement related to the use of native material because contractors had a hard time getting appropriate compaction.  Exh. A-1 to City's Mot. for Summ. J., ECF No. 79-2, at 5.  The City found that Class 6 material was easier to compact and the use of Class 6 materials became a preference, if not a *de facto* standard, in City projects.[3]  *Id.*, at 6-7.  Class 6

_____

[2]Colorado Department of Transportation.

[3]For approximately ten years in the 1980s and 1990s, according to Mr. Waters, almost all construction work in the City was on City projects, not private development,

material was specified as backfill in the bid for the Acoma SID.  Exh. A-5 to City's Mot. for Summ. J., ECF No. 79-7.  Applications for right of way construction permits stated that "Class 6 road base, or equal per CDOT specifications, is required" for trench backfill material.  Exh. 16 to Pls.' Resp., ECF No. 82-16.

The CDS were revised, effective May 22, 2007.  The 2007 CDS specifically provide that trench backfill for city right of ways, roadways, alleys and driveways "shall be approved road base material (CDOT Class 6 A.B.C) for the full depth of the trench."  2007 CDS, Exh. A-9 to City's Mot. for Summ. J., ECF No. 79-11, at Sec. 2.4.2.B.  However, the 2007 CDS also give the City Engineer authority to enforce and administer the CDS (Sec. 1.1), to make changes to approved plans or specifications (Sec. 1.7), to permit substitution of materials or equipment "if sufficient information is submitted to allow the Engineer to determine that the material or equipment proposed is equivalent or equal to that named" (Sec. 2.3.3), and to require additional tests to be taken to substantiate compaction requirements (Sec. 2.4.2.B).

During the relevant time period, two other projects were permitted to use native soil as backfill.  One of those projects was the Rodeo PUD, a residential development.  Its engineer, and part owner, is Clinton "Cap" Allen.  Phase 1 of the Rodeo project was subject to the 1980 CDS. Sometime in late 2005, Mr. Allen made a proposal to the City Engineer (at the time, Jon Butler) requesting to use native material as trench backfill.  In a letter to Mr. Butler dated December 6, 2005, Mr. Allen provided a detail of the proposed trench construction, proposed testing, and various provisions for site supervision and inspection.

_____

due to the area's economic conditions.  *Id.*, at 6.

Exh. A-10 to City's Mot. for Summ. J., ECF No. 79-12.  In a letter in response, Mr. Butler indicated a willingness to permit the use of native material but imposed additional and more stringent requirements relating to compaction and testing.  Exh. A-11 to City's Mot. for Summ. J., ECF No. 79-13.  Phase 1 of the Rodeo project apparently successfully used native material as trench backfill.  Mr. Allen then sought to use the same materials for Phase IIA of the Rodeo project, which was subject to the 2007 CDS.  Defendant Nickerson, who became the Director of Public Works in April 2007, allowed the continued use of native material as backfill on the project.[4]

The second project that was permitted to use native soil as backfill was the Southwest Memorial Hospital PUD (the "Hospital" project).  This was a commercial development in connection with a hospital special district.  Again, the engineer with the project, Ryan Griglack, made a proposal to the City to use native soil and CDOT specifications related to compaction and testing.  Griglak Dep., Exh. A-1 to City's Mot. for Summ. J., ECF No.79-1, at 13-18, 27-28.  This phase of the Hospital project was governed by the 1980 CDS.  After a series of negotiations and design modifications, the City permitted native soil to be used on the Hospital project as backfill.  *Id.*  In connection with the proposal and negotiation, Mr. Griglack provided the City with a geotechnical engineering report, soil tests, and a pavement design in order to satisfy the City Engineer that the proposal would meet the City's requirements regarding compaction, settlement, and other specifications.  *Id.*

---

[4]Plaintiffs contend that the City did not have discretion to permit this under the 2007 CDS, which were applicable to the Rodeo IIA project.  Since Plaintiffs' challenge concerns equal treatment, not whether the City officials acted *ultra vires*, I need not address the question of whether this decision violated the 2007 CDS.

It is undisputed that none of the Plaintiffs nor anyone on their behalf ever requested to use native material for backfill on their projects[5].  Plaintiffs contend that this was because they believed the City was inflexible in its informal requirement that Class 6 materials be used, even though the 1980 CDS made no provisions in this regard.  Mr. Griglack and Mr. Allen were also aware of the City's general requirement of Class 6 materials but believed that using native soil would be preferable from a cost and performance perspective and sought to persuade the City accordingly.   Their use of native soil was not kept secret; indeed, Mr. Griglack claims he is a strong advocate of this practice.  Griglak Dep., Exh. A-1 to City's Mot. for Summ. J., ECF No.79-1, at 61.   It appears that developers of other projects also used Class 6 materials and, like Plaintiffs, were never told by the City that in some circumstances the City might permit native soil to be used.  Exh. A-4 to City's Mot. for Summ. J., ECF No. 79-6.  The evidence suggests that unless a request was made, the issue did not arise.

The second major issue in this litigation arises from a dispute regarding the adequacy of a road under construction in a portion of the Brandon's  Gate development.  In the spring of 2007, Mr. Smart became aware of problems with the subgrade on 1000 linear feet of the roadway in Brandon's Gate, Block 6.  Exh. A-1 to City's Mot. for Summ. J., ECF No. 79-2, at 23.  It had been a particularly wet spring and portions of the roadway were saturated and soggy and there was some concern about whether the roadway could

---

[5]Furlong, however, did request to use sandstone as backfill for a portion of the Brandon's Gate project.  There is a factual dispute as to whether sandstone is a Class 6 material or simply has equivalent properties under certain circumstances if properly processed.  The City, through Mr. Smart, permitted Furlong to use sandstone on a trial basis.

hold a road.  Eric Gray, the then City Engineer, shared these concerns.  Jon Butler, who was formerly the City Engineer but at this time worked for a private engineering firm, was consulted to perform analysis and assist in determining what needed to be done.  The principals of Furlong and D & L believed that the addition of storm drains would solve the moisture problems and that the design for the road was adequate.

On April 19, 2007, there was a meeting at the Block 6 site with Mr. Butler, representatives of Furlong and D & L, Bruce Smart (the Director of Public Works), and Eric Gray (the City Engineer).  Four compaction tests were performed on the subgrade material, which showed results within standards.  Exh. 29 to Pls.' Resp., ECF No. 82-29.  Mr. Butler followed up with a letter dated April 24, 2007 to Mr. Gray "to provide general comments regarding the strength characteristics of the proposed pavement section for the subject project."  Exh. 28 to Pls.' Resp., ECF No. 82-28.  He notes that the proposed design consists of 2 ½ inches of pavement supported over eight inches of CDOT Class 6 aggregate material.  *Id.*  "The actual strength characteristics, or R-Value, of the subgrade support material has a major influence on the overall strength of the pavement section."  *Id.*  The R-value for the roadway was not known but Mr. Butler anticipated that it would range from 5-10, which is typical for the area.  *Id.*  Mr. Butler notes that there are several other factors that could influence the overall performance of the pavement section but that the proposed use of a woven geotextile fabric placed between the subgrade soils and the gravel/asphalt section could improve the overall strength and compaction of the materials.  *Id.*

The principals of Furlong and D & L believed that they had an agreement with the City as a result of the April 19, 2007 meeting that their road design would be adequate, as

did Mr. Butler.   Butler Dep., Exh. 5 to Pls.' Resp., ECF No. 82-5, at 32.   Defendant Nickerson replaced Mr. Smart as Director of Public Works on April 30, 2007.   When Defendant Nickerson took over, Mr. Gray related his concerns about the adequacy of the roadway design for Block 6.   Mr. Nickerson reviewed soils reports for the property and visited the site.   Another meeting was held with Mr. Nickerson, Mr. Gray, Mr. Butler, and representatives from Furlong on May 15, 2007.   In a letter dated May 16, 2007, addressed to John Stramel of Furlong, Mr. Nickerson states that as a result of the meeting, "it is my understanding that the following agreement is in place."   Exh. A-15 to City's Mot. for Summ. J., ECF No. 79-17.   The agreement he recites is that the roadway would be paved with 3 ½ inches of asphalt, instead of the 2 ½ inches originally designed, and that there would be additional geotechnical testing with appropriate designs to be submitted to the City for review.   *Id.*   Mr. Kimble and Mr. Stramel deny that any agreement was reached at the May 15, 2007 meeting, stating their understanding was that Furlong would look into the issues, not that it had agreed to the increased asphalt.   Stramel Dep., Exh. A-1 to City's Mot. for Summ. J., ECF No. 79-3, at 35.

In response to Mr. Nickerson's letter, Mr. Stramel wrote a letter dated May 18, 2007. Exh. A-15 to City's Mot. for Summ. J., ECF No. 79-18.   In it, he states "we wish to clarify that we are not in agreement with [Mr. Nickerson's] letter."   *Id.*   He goes on to say that "we feel that it is [in] everyone's best interest to stay with the original road design for Block 6 in Brandon's Gate, as agreed upon by Bruce Smart, Eric Gray, Jon Butler for Trautner Engineering, Dave Waters of D & L Construction, David Kimble, and myself.   This meeting was held on site and on the afternoon of 04-19-2007."   *Id.*   Mr. Stramel goes on to say that he believes the soils are adequate to hold a road, particularly since a road under

8

construction on nearby streets is not being required to be built to a higher standard.  *Id.*

"We realize that this is not the City Engineer's opinion.  We also realized that the new City

Engineer's opinion is not consistent with that of the area's professionals (i.e., engineering

firms, road construction companies, gravel companies, and asphalt professionals.)"  *Id.*

Finally, he states that "we would like to clarify that if a geotechnical firm is contracted to do

an engineered pavement design that the City Engineer will abide by that design."  *Id.*

Mr. Nickerson responded to Mr. Stramel's letter with the "cease and desist" letter at

issue.  Exh. A-17 to City's Mot. for Summ. J., ECF No. 79-19.  The letter, containing a

subject line of "Brandon's Gate Paving - Block 6," states,

> Apparently our meeting has produced no positive outcome.
> You are correct in that the City does not agree with your
> proposed pavement section.  It is the City's opinion that the
> use of this pavement section will result in an inadequate
> roadway, yielding in a design life of significantly less than the
> anticipated 20-year design standard.  This correspondence
> shall  serve as a cease and desist order on further road
> construction in Brandon's Gate until all issues set forth in this
> letter are adequately addressed.

*Id.* Mr. Nickerson then cites provisions in the CDS which require soils sampling and testing

and states that Furlong will be required to submit a soils report and street design to the City

Engineer for review.  *Id.*  It appears that at the time Mr. Nickerson wrote the letter he was

unaware of the compaction tests and results.

Approximately a week later, Mr. Nickerson issued at "Construction Engineering

Memo," dated May 30, 2007, to Furlong and its principals.  The memo reads as follows:

> In order to provide an atmosphere of partnering, and to
> expedite construction of the Block 6 portion of the project, the
> City will agree to pay for a Geotechnical Pavement Design
> Study in order to determine the appropriate pavement section
> that will be required for the soil types in the roadway.  The City

> realizes this is a departure from the previously agreed upon
> roadway section, however additional due diligence is warranted
> in order to provide a roadway that will adequately serve the
> residents for the required 20-year design life.  If the study
> results in additional cost required to complete the roadway, the
> City is willing to bear these costs.  The 'cease and desist' order
> will be lifted upon the acceptance of these terms.  The City,
> however, is not willing to bear delay costs as a result of this
> action.  Your cooperation in this matter is appreciated and if
> you have any questions, please do not hesitate to contact me.

Exh. A-18 to City's Mot. for Summ. J., ECF No. 79-20.  The memo was signed without comment by Mr. Kimble (Mr. Stramel was out of the country) but the Plaintiffs contend that Mr. Kimble did not have authority to bind Furlong to any agreement and that he signed only for receipt.

The City did pay for the soils tests and engineering report, performed by Mr. Butler's firm.  Exh. A-19 to City's Mot. for Summ. J., ECF No. 79-21.  The report confirmed that the soils at issue were of questionable strength in a few spots and made suggestions regarding construction and subgrade stabilization.  *Id.*  The report also showed that there were lower R-values on Block 6 than on the nearby section of road that Mr. Stramel contended was equivalent.  *Id.*  In the end, however, Mr. Nickerson allowed Furlong and D & L to build the road as originally designed, although with additional subgrade fill.

In his deposition testimony, Mr. Butler agrees that the City had justifiable concerns about the subgrade on Block 6.  Butler Dep., Exh. A-1 to City's Mot. for Summ. J., ECF No. 79-1, at 71.  Indeed, Furlong's own engineer, Terri Forth stated in her deposition that while she felt the subgrade was adequate, she did not have test results to back up her opinion.  Exh. 7 to Pls.' Resp., ECF No. 82-7, at 37.

Furlong contends that the cease and desist order was unconstitutional and violated

the SIA.  The SIA provides that "If the City determines that there is a violation of present State laws, City regulations, Planning Commission requirements, and/or the terms and provisions of this Agreement, the Public Works Director may issue a cease and desist order."  SIA, Exh. A-3 to City's Mot. for Summ. J., ECF No. 79-5, at ¶ 17.  Furlong argues that there was no violation of any law, regulation, requirements or of the SIA and so the issuance of the cease and desist order was improper.  Furlong alleges additional breaches of the SIA because the City required Furlong to build an access road ahead of schedule but then closed the road after there were problems with mud being tracked.  Furlong also contends that the City required "construction of improvements beyond the improvements specified in the Furlong SIA."  Amended Complaint, ECF No. 8, ¶ 53.  Furlong has not specified what this refers to, however, and so I deem this basis of the claim to be abandoned.

Standard of Review

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56.  A factual issue is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).

Where "the moving party does not bear the ultimate burden of persuasion at trial, it may satisfy its burden at the summary judgment stage by identifying 'a lack of evidence for the nonmovant on an essential element of the nonmovant's claim.'"  *Bausman v. Interstate Brands Corp.*, 252 F.3d 1111, 1115 (10th Cir. 2001) (quoting *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998)).  Then, "[t]o avoid summary judgment, the nonmovant must establish, at a minimum, an inference of the presence of each element

essential to the case." *Id.*

## Discussion

Defendant City moves for summary judgment on the grounds that Plaintiffs cannot demonstrate constitutional violations or that the SIA was breached.  Defendant Nickerson moves for summary judgment on qualified immunity grounds with respect to the constitutional claims and on the grounds that he did not personally enter into any agreement with Furlong.  I will address the arguments and applicable law for each of Plaintiffs' claims in turn.

I address at the outset certain evidentiary objections Plaintiffs raise in their response briefs to both motions.  Plaintiffs argue that I should not accept as evidence Defendant Nickerson's testimony as contained in his affidavit because its reliability is called into question, citing *Argo v. Blue Cross Blue Shield of Kansas, Inc.*, 452 F.3d 1193, 1199 (10th Cir. 2006).  As grounds, Plaintiffs offer affidavit and depositions from City employees and others who have a poor opinion of Mr. Nickerson's truthfulness.  *Argo* sets forth the usual standard for evidence to be considered at the summary judgment stage, *i.e.*, that "a court necessarily may consider only the evidence that would be available to the jury." *Id.*  The statements contained in Mr. Nickerson's affidavit are primarily factual statements that are based on personal knowledge and are consistent with the documentation created contemporaneously.  While I need not take as undisputed any self-serving statements regarding intent or his interpretation of the relevant documents, I see no basis to disregard his testimony as to factual matters and events that occurred.

Plaintiffs also contend that certain documents and deposition testimony from persons with technical knowledge, such as Mr. Butler, should be disregarded as

12

"undisclosed expert testimony."  Most of these witnesses are fact witnesses, not specially

retained experts, whose knowledge and role in the relevant events were well known to

Plaintiffs since before the litigation commenced and their testimony concerns the events

that occurred and their observations and conclusions from the time.    Similarly, the

documents were created contemporaneously and are not expert reports containing

opinions for the purposes of litigation.  In the absence of a motion to strike containing legal

authority and persuasive argument, I will consider this evidence.[6]

A.    City's Motion for Summary Judgment

        1.    Equal Protection

        The Equal Protection Clause provides that "[n]o State shall ... deny to any person

within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.  Equal

protection "is essentially a direction that all persons similarly situated should be treated

alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). The Clause "does

not forbid classifications.   It simply keeps governmental decisionmakers from treating

differently persons who are in all relevant respects alike."  *Nordlinger v. Hahn*, 505 U.S. 1,

10 (1992).  If groups are treated differently, the government must provide some justification

for the difference in treatment; unless the classification involves a suspect class or

fundamental rights, the government can overcome an equal protection challenge by

showing that the classification bears a "rational relation to some legitimate end."  *Kinnell*

*v. Graves*, 265 F.3d 1125, 1128 (10th Cir.2001) (quoting *Romer v. Evans*, 517 U.S. 620,

---

        [6]I note that the City's motion also contains evidence from retained experts who
may not have been disclosed to Plaintiffs; because I do not rely on that evidence to
resolve the issues on summary judgment, I do not address the question of whether it is
admissible.

631 (1996)).  Plaintiffs do not claim to belong to a suspect class and do not dispute that essentially they bring their claims as a "class of one."  *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) ("Our cases have recognized successful equal protection claims brought by a 'class of one,' where the plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment.").  To succeed on an equal protection claim as a "class of one," a party must demonstrate that (1) it has been intentionally treated differently than those similarly situated, *see Barney v. Pulsipher*, 143 F.3d 1299, 1312 (10th Cir.1998); and (2) the difference in treatment was "objectively irrational and abusive," *see Jicarilla Apache Nation v. Rio Arriba County*, 440 F.3d 1202, 1211 (10th Cir. 2006).

The City argues that Plaintiffs' equal protection claim fails because they cannot demonstrate that they were treated differently from similarly situated persons with respect to being granted permission to use native soil as backfill instead of Class 6 material.[7]  I agree.  It is undisputed that the City did not suggest to any developers that they might use native soils and so in this regard the City treated all of the developers identically.  The City allowed native soil to be used by persons who requested and made a persuasive case, including appropriate tests and engineering, that the use of native soil would comply with the City's requirements regarding compaction and performance.  Persons who did not make such a request were not granted permission.  Plaintiffs are simply not similarly situated to the developers of Rodeo and the Hospital projects because they did not request

---

[7]The City further argues that Plaintiffs cannot demonstrate discriminatory intent. Because I conclude that Plaintiffs have not shown that they were treated differently from similarly situated persons, I do not address the arguments relating to intent.

or offer evidence to the City to show that the native materials could satisfy the City's requirements.[8] Plaintiffs were not "prohibited" from using native soil as backfill, they simply never tried.

In response, Plaintiffs contend that the issue of whether they were similarly situated to the Rodeo and Hospital project developers must be determined by a jury.  I disagree. While the question of whether two entities are similarly situated is often a question of fact, the Tenth Circuit has made clear that at summary judgment, it is my role to determine whether the "plaintiff has adduced enough evidence to support a finding that the [alleged comparator] and plaintiff were sufficiently similarly situated to support an inference of discrimination."  *Riggs v. AirTran Airways, Inc.*, 497 F.3d 1108, 1117 (10th Cir. 2007). Here, there is no issue of fact to resolve regarding the key differences between Plaintiffs and the representatives of the Rodeo and Hospital projects, *i.e.*, whether a request or proposal was made to use an alternative to the City's standard specification for backfill material.  The City has also presented undisputed evidence that developers who, like Plaintiffs, did not request to use native soils were treated exactly the same as Plaintiffs.

Plaintiffs also appeared to argue that they were discriminated against because they were required to enter into SIAs with the City, whereas a few other projects were not required to do so.  The City has offered evidence as to why certain projects were not required to enter into an SIA, including that the requirement was waived by the City Council or because the project was a City project.  Plaintiffs do not respond to this argument and

---

[8]Alternatively, even if Plaintiffs were similarly situated to these developers, the failure of Plaintiffs to make a request and demonstrate that native soil would be suitable as backfill on their projects provides a perfectly rational basis for the difference in treatment.

so I deem they have conceded that there was no equal protection violation in the City's requirement that they enter into SIAs.

Furlong also claims that the issuance of the cease and desist letter was a violation of its equal protection rights.  It is again unclear what Furlong considers to be the relevant class for the purposes of this claim and so I will again assume Furlong considers itself to be a class of one.  Furlong does not identify any other persons it claims were similarly situated but received different treatment from the City.  The situation presented here is that of a developer or other builder who has stated an intent to proceed with a design despite concerns from the City Engineer and Public Works Director about the strength and stability of the resulting product.  Furlong has shown no similar situation in which a developer was permitted to continue without interference from the City.  To show unequal treatment, Furlong relies on its contention that the City had not issued a "cease and desist" letter for some 25 years.  However, the evidence shows that numerous "stop work" orders had issued by the City with regard to a variety of projects.  Exh. A-20 to City's Mot. for Summ. J., ECF No. 79-22.  Plaintiffs fail to demonstrate any meaningful distinction between the cease and desist order, which stopped work on road construction at Brandon's Gate until the City was satisfied that the design would meet its performance requirements, and the stop work orders issued previously, which also ordered a halt to construction projects until the City determined that the project was in compliance with governing law and regulations.[9]

_____

[9]Furlong argues unpersuasively that the cease and desist order was issued by the Director of Public Works, while the stop work orders were often issued by building inspectors.  Given that in each case representatives of the City halted work on ongoing projects based on a perceived violation of pertinent regulations, I see no difference in these types of orders.

16

In the absence of any showing that Furlong was treated differently from those in a like position, I conclude that summary judgment is appropriate on this claim as well.

      2.   <u>Substantive Due Process</u>

"Substantive due process arises from the Fourteenth Amendment's protections against governmental deprivations 'without due process of law.'" *Williams v. Berney*, 519 F.3d 1216 (10th Cir. 2008).  It extends to bar certain government conduct regardless of the fairness of the procedures used to implement them.  *Id.* (citations omitted).  "In its substantive mode, the Fourteenth Amendment provides protection against arbitrary and oppressive government action, even when taken to further a legitimate governmental objective." *Seegmiller v. LaVerkin City*, 528 F.3d 762, 767 (10th Cir. 2008) (citations omitted).  Substantive due process doctrine is broadly divided into two areas, one "protects an individual's fundamental liberty interests, while the other protects against the exercise of governmental power that shocks the conscience." *Id.*

A fundamental right or liberty interest is one that is "deeply rooted in this Nation's history and tradition" and "implicit in the concept of ordered liberty." *Chavez v. Martinez*, 538 U.S. 760, 775 (2003).  Plaintiffs do not appear to contend that this case concerns a fundamental liberty interest.  Rather, it seems their claim is that the City and Nickerson acted so arbitrarily that it deprived Plaintiffs of their substantive due process interests.

Under Supreme Court case law, "only the most egregious official conduct can be said to be arbitrary in the constitutional sense." *County of Sacramento v. Lewis*, 523 U.S. 833, 840 (1998) (quotations omitted).  A plaintiff is required to show a "level of executive abuse of power ... that ... shocks the conscience." *Id.* at 846.  This means a showing of government officials "abusing their power, or employing it as an instrument of oppression."

17

*Id.* at 845-46 (quotations and brackets omitted).

To prevail on any due process claim, a plaintiff must first establish that a defendant's actions deprived the plaintiff of a protectible property or liberty interest. *Crider v. Board of County Com'rs of County of Boulder*, 246 F.3d 1285 (10th Cir. 2001). "An individual has a property interest in a benefit for purposes of due process protection only if he has a 'legitimate claim of entitlement' to the benefit, as opposed to a mere 'abstract need or desire' or 'unilateral expectation.'" *Teigen v. Renfrow*, 511 F.3d 1072, 1078-79 (10th Cir. 2007) (citation omitted). Defendants argue that Plaintiffs cannot show that they had a constitutionally protected property or liberty interest in using native soils instead of Class 6 materials or in being informed that the City might permit this under certain circumstances. In addition, Defendants contend that even if this were a protected interest, Plaintiffs were not deprived of this right since they never asked to exercise it. Finally, Defendants argue that the City's actions were not conscience shocking or arbitrary. With respect to the cease and desist order, Defendants again argue that there was no property interest or arbitrary government action since there was legitimate concern about the road construction.

With respect to the backfill issue, Plaintiffs contend that they had a property right based on various City ordinances or regulations. *Hulen v. Yates*, 322 F.3d 1229, 1240 (10th Cir. 2003) ("constitutionally protected property interests are created and defined by statute, ordinance, contract, implied contract and rules, and understandings developed by state officials."). However, Plaintiffs do not offer any clear explanation to demonstrate that they had any kind of property right in being permitted to use a particular material as backfill or in having the City suggest that they present a proposal to do so. Plaintiffs first argue that they "had a property right based on a legitimate claim of entitlement to the use of native

18

material for trench backfill because the City did not have discretion." Pls.' Resp., ECF No. 82 at 24.  I understand this to mean that Plaintiffs are arguing that the City did not have discretion to deny them the ability to use native materials.  This is directly in conflict with their other arguments that the City did <u>not</u> have discretion to permit the other property owners to use native soils[10] and is unsupported by any regulation, construction standard, or other evidence that would show an entitlement in this regard.[11]  Plaintiffs also argue that they had a property right to use their properties in any manner to which they saw fit, but provide no explanation for the role of the City's numerous regulations, CDS, and other appropriate regulations applicable to their projects.  Plaintiffs next contend they had a property right in the CDS not being amended without procedure and that "the City acted in secret to allow Rodeo and the [Hospital] to use native material for trench backfill."  Pls.' Resp., ECF No. 82, at 25.  Since the CDS did not prohibit the use of native soil, I see no improper "amendment" or "secret" actions with respect to the Rodeo and the Hospital projects.

Plaintiffs have not identified any standard, regulation, statute, or other binding rule that would have given them a legitimate claim of entitlement, rather than a unilateral desire

---

[10]See Pls.' Resp., ECF No. 82, at 8, 18.

[11]Plaintiffs only evidence in this regard is a December 8, 2005 letter from the City to Cap Allen responding to Mr. Allen's proposal to use native soil.  Exh. A-11 to City's Mot. for Summ. J., ECF No. 79-13.  In the letter, the City Engineer (Mr. Butler) states as follows: "Generally, the City does not allow native material to be used for backfill material on small projects such as repair projects.  However, on relatively large earthwork projects the City of Cortez will allow the use of native material for backfilling over the initial backfill, provided certain specifications are adhered to . . . ."  *Id.*  This letter clearly reserves to the City the discretion to determine what type of backfill is appropriate and does not indicate that the City must permit the use of native soil absent a request and satisfactory evidence that the proposed material will be effective.

or expectation, regarding the types of material permitted to be used for backfill.  They have also not shown that there was any rule imposing a duty on the part of City representatives to inform Plaintiffs of potential alternatives to the preferred standard.

Even if Plaintiffs demonstrated that they had a protectible property interest, I see nothing in Defendants' conduct that shocks the conscience.  Plaintiffs offer no evidence to indicate that had they made a proper request and shown that they could meet the City's compaction and durability requirements, the City would have denied them the opportunity to use native material as an alternative to the preferred Class 6 material.  Plaintiffs and the Rodeo and Hospital developers were all in the essentially the same position: they received the same information from the City regarding its *de facto* standard for backfill material and the City did not suggest to any developers that it might vary from this standard.  However, as noted by the City, unlike the Rodeo and the Hospital projects, "Plaintiffs simply failed to explore, pursue or otherwise exercise due diligence related to their projects, they failed to ask the City about the feasibility or suitability of using native material and they failed to submit plans or proposal for using same."  City's Reply, ECF No. 92, at 14.  I see no oppressive abuse of government authority in the City's failure to suggest to Plaintiffs that they make the same efforts that other developers had made.

Similarly, with respect to the cease and desist order to Furlong, even if I assume Furlong had a property interest in continuing to build its road, I again see no arbitrary conduct by the City that shocks the conscience.  Rather, the undisputed evidence shows that the City Engineer and Public Works Director had a concern about the stability of the roadway.  Although Plaintiffs disagree that there was a problem, they have not shown that the concern was illegitimate or objectively unreasonable.  The undisputed evidence,

including from Furlong's engineer, indicate that there were no definitive tests showing the strength of the soils on Block 6 and neutral third parties such as Mr. Butler agreed that there were indications that could give rise to concern.  Defendant Nickerson had only just become the City's Public Works Director and there is nothing to suggest that he had any hostility at the time[12] toward Furlong or its principals.  Furlong wrote Mr. Nickerson a letter indicating that despite the City's concerns, it intended to build the road as originally planned.

Under the circumstances, I see nothing arbitrary or abusive in Mr. Nickerson's decision to use his authority to halt construction until he was satisfied that the road would perform as the City required.  Indeed, by thereafter offering to have the City bear the costs of additional testing and lifting the cease and desist order upon agreement that such testing and redesign would be done, it is clear that his intent was directed at solving the problem and properly constructing the road, not at harassing or oppressing Furlong.  I conclude that no reasonable jury could find otherwise.  The fact that Nickerson thereafter changed his mind does not show that the initial decision was unreasonable or done with wrongful intent. Therefore, Plaintiffs' substantive due process claims also fail.

---

[12]Plaintiffs provide evidence from later incidents to show that Mr. Nickerson became frustrated and used profanity with or in reference to them.  These later incidents, however, do not bear on the decisionmaking at the time of their first interaction in May 2007.  Plaintiffs, in their Second Supplemental Response (ECF No. 105), also provide evidence concerning a recent dispute with the City arising after a water main break raised questions about what backfill materials were actually used in the Brandon's Gate development.  Plaintiffs rely on communications from counsel and various complaints about how the City investigated the issue to assert that the City and its officials have personal hostility towards them.  None of this evidence from 2010-11 bears on the relevant issues from 2006-7.  If the Plaintiffs believe that Defendants have acted improperly with regard to the most recent disputes, they may pursue whatever remedies they feel is appropriate.

3.     Breach of Contract

The City moves for summary judgment on Furlong's breach of contract claim for the City's alleged violations of the SIA.  I agree that summary judgment is appropriate.

Interpretation of a contract is a question of law.  *Ad Two, Inc. v. City and County of Denver, ex rel Manager of Aviation,* 9 P.3d 373, 376 (Colo. 2000).  "A court's duty is to interpret a contract in a manner that effectuates the manifest intention of the parties at the time the contract was signed.  The touchstone in determining the intention of the parties is the language of the written agreement.  If the language is plain, clear and unambiguous, a contract must be enforced as written."  *Randall & Blake, Inc. v. Metro Wastewater Reclamation Dist.*, 77 P.3d 804, 806 (Colo. App. 2003) (citations and internal punctuation omitted).  Whether a contract is ambiguous is also a question of law for the court.  *Pepcol Mfg. Co. v. Denver Union Corp.,* 687 P.2d 1310, 1314 (Colo. 1984).  A contract is ambiguous when it is susceptible to more than one reasonable interpretation.  *National Cas. Co. v. Great Southwest Fire Ins. Co.*, 833 P. 2d 741, 746 (Colo. 1992).  If I conclude that a contract is ambiguous then its meaning is a question of fact to be determined by the jury or court.  *Dorman v. Petrol Aspen, Inc.*, 914 P.2d 909, 919 (Colo. 1996).

As noted, Furlong argues that even though the SIA gives the City authority to issue a cease and desist order, that power was improperly used because no actual violation had occurred, or, at a minimum, there is a factual dispute as to whether there was a violation.

I first examine the SIA and its purpose.  As noted, the SIA governs the developer's obligation to construct public improvements in a residential or commercial development.  Brandon's Gate SIA, Exh. A-3 to City's Mot. for Summ. J., ECF No. 79-5, at ¶ 1.  These public improvements are to be built in accordance with the specifications submitted by the

22

developer and with all legal standards. *Id.* In the preamble, the SIA states that "the purpose of this Subdivision Improvements Agreement . . . is to protect the City from incurring the cost of completing the improvements under this [Agreement] and not to benefit those providing work, services or material or the lot or home buyers in the Development; and the purpose of this Agreement is further to guarantee performance of Developer's other obligation." *Id.*, at preamble. The preamble further makes clear that the overriding concern of the City is "to protect the health, safety and general welfare of the community by requiring the completion of various improvements in the Development and thereby limit the harmful effects of substandard development and subdivision." *Id.* The provisions concerning the power to issue cease and desist orders is in a paragraph entitled "Enforcement," and expressly states that an order may issue if the City determines that there is a violation of a regulation or construction standard or of the SIA. *Id.* at ¶ 17. The SIA also permits the City to modify the SIA without the consent of the developer if it "determines that certain provisions of [the SIA] fail to achieve the goal of limiting the City's liabilities and/or obligations under [the SIA]." *Id.* at ¶ 37.

The clear and expressly stated purpose of the SIA is to ensure that the developer builds the improvements in compliance with law and regulation and to protect the City from incurring costs or obligations in completing the improvements or addressing substandard work. Moreover, the power to determine that a violation has occurred is vested solely in the City. In light of this language, I conclude that the agreement unambiguously gives the City the discretion to determine on its own that the construction of improvements is not in accordance with standards and to take action accordingly. Here, the evidence is undisputed that the City Engineer and Director of Public Works had an objectively

reasonable belief that the road under construction would not satisfy the City's strength and durability requirements.  Given that the benefits of the SIA inure to the City, not to the developer, I conclude that the City's good faith determination in this regard, even if possibly mistaken, cannot amount to a breach.  This is particularly so where the cease and desist was intended to be lifted as soon as the City's concerns were addressed.  Accordingly, I agree that summary judgment should enter against Furlong on this claim.

Furlong's second basis for breach is that the City required it to accelerate the construction of a road in the subdivision, called Gateway Drive, but then closed it for some time.  It appears that in addition to constructing Gateway Drive, the SIA required Furlong to "pioneer" an additional short section of dirt road connecting Gateway drive to another city street; the City would pave it thereafter.  There is no dispute that the SIA required the construction of Gateway Drive and of the short dirt section, Furlong's only dispute that is that it had to do so sooner than it wanted.  Furlong claims this acceleration was clearly unnecessary because, when the unfinished dirt section was used and began causing problems with mud around the property, the City closed the entire road for nearly two years (until it had the funds to complete the paving).  Furlong also claims that it offered to gravel the dirt section but that Defendant Nickerson rejected this and simply kept the road closed. Furlong does not identify any provision in the SIA that was allegedly breached by this conduct and I see no basis to conclude that there was a breach.

B.   Nickerson's Motion for Summary Judgment

Defendant Nickerson moves for summary judgment on the basis of qualified immunity.  "In an action under section 1983, individual defendants are entitled to qualified immunity unless it is demonstrated that their alleged conduct violated clearly established

constitutional rights of which a reasonable person in their positions would have known." *Murrell v. Sch. Dist. No. 1, Denver, Colo.*, 186 F.3d 1238, 1251 (10th Cir. 1999). Once a defendant has raised qualified immunity as an affirmative defense, the plaintiff bears the heavy two-part burden of demonstrating that (1) the defendant violated a constitutional right and (2) the constitutional right was clearly established at the time of the alleged conduct. *Reynolds v. Powell*, 370 F.3d 1028, 1030 (10th Cir. 2004). Because I have found that no constitutional violation occurred, I need not address the second prong of the qualified immunity analysis.

Mr. Nickerson also argues that he is not a party to the SIA and therefore cannot be liable for any alleged breach. Plaintiffs do not contest this; moreover, as discussed above, I conclude there was no breach. Therefore, summary judgment in Defendant Nickerson's favor is appropriate on all claims asserted against him.

Accordingly, it is ordered:

1. Defendant City of Cortez' Motion for Summary Judgment (ECF No. 79) and Defendant Nickerson's Motion for Summary Judgment Based Upon Qualified Immunity (ECF No. 72) are granted. The claims against both Defendants are dismissed and judgment shall enter in their favor and against Plaintiffs.

2. Defendants may have their costs.

DATED at Denver, Colorado, on March 29, 2011.

BY THE COURT:

s/ Walker D. Miller
United States Senior District Judge